**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL TRAILER GROUP, LLC, a Texas Citizen, | § § § § § § § § § § § § § § § | |
| Plaintiff | | |
| v. | | Case No. 1:25-cv-01168-DAE |
| SHORT GO, INC. d/b/a TWISTER TRAILER, a Kansas and Louisiana Citizen, and BOSS RANCH, LLC, a Louisiana Citizen, | | JURY TRIAL DEMANDED |
| Defendants. | | |

## ANSWER TO COMPLAINT

NOW COME Defendants SHORT GO, INC. d/b/a TWISTER TRAILER ("Short Go") and

BOSS RANCH, LLC ("Boss Ranch", collectively, "Defendants"), by and through their attorneys,

Seyfarth Shaw LLP, and for their Answer to Complaint to Plaintiff INTERNATIONAL TRAILER

GROUP, LLC hereby state as follows:

## THE PARTIES

**COMPLAINT ¶1:**

Plaintiff International Trailer Group, LLC ("Plaintiff" or "ITG") is a limited liability company organized and existing under the laws of the State of Texas, having its principal place of business in Brenham, Washington County, Texas. Its sole member is Daniel Perez, an individual and citizen of the State of Texas.

**ANSWER:**

Upon information and belief, Defendants admit that Plaintiff International Trailer Group,

LLC is a limited liability company organized and existing under the laws of the State of Texas and

having its principal place of business in Brenham, Washington County, Texas.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 1 and therefore deny the same.

**COMPLAINT ¶2:**

Defendant Short Go, Inc. ("Short Go" and, together with Defendant Boss Ranch, LLC, "Twister Trailer"), is a corporation organized and existing under the laws of the State of Louisiana having its principal place of business located in the State of Kansas. It is a citizen of the States of Louisiana and Kansas and may be served through its registered agent for service of process, Stewart Gulager, 400 N. National Avenue, Fort Scott, Kansas 66701. Short Go does business under the name "Twister Trailer," as described more particularly below.

**ANSWER:**

Defendant denies Plaintiff's characterization of ShortGo, Inc. and Defendant Boss Ranch, LLC.

Subject to and without waiving the following, Defendant admits the remaining allegations in Paragraph 2 of the Complaint.

**COMPLAINT ¶3:**

Defendant Boss Ranch, LLC ("Boss Ranch" and, together with Defendant Short Go, Inc., "Twister Trailer") is a limited liability company organized and existing under the laws of the State of Louisiana having its principal place of business located in the State of Louisia at 103 Jean Baptiste Drive, Lafayette, Louisiana 70503. Its sole member is Steven Brent Mosing, an individual and citizen of the State of Louisiana. It may be served through its manager or officer, Steven Brent Mosing, 103 Jean Baptiste Drive, Lafayette, Louisiana 70503.

**ANSWER:**

Defendant admits the allegations in Paragraph 3 of the Complaint.

**JURISDICTION AND VENUE**

**COMPLAINT ¶4:**

The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Plaintiff is a citizen of Texas by virtue of the fact that its sole member, Daniel Perez, is a citizen of Texas. Defendants are citizens of Kansas and Louisiana. Short Go is a Kansas corporation with its principal place of business in Kansas. Boss Ranch is a Louisiana limited liability company whose sole member, Steven Brente Mosing, is a citizen of Louisiana; Boss Ranch is therefore a citizen of Louisiana. There is therefore complete diversity of citizenship. Plaintiff seeks more than $1 million in monetary relief.

**ANSWER:**

The allegations in Paragraph 4 of the Complaint are conclusion of law to which no response

is required. To the extent a response is deemed required, Defendants deny the allegations contained

in Paragraph 4.

**COMPLAINT ¶5:**

This Court has personal jurisdiction over each Defendant because each Defendant does business in Texas as that term is interpreted and applied under the Texas long-arm statute, TEX. CIV. PRAC. & REM CODE §17.041 *et seq.* Federal courts may exercise personal jurisdiction over a defendant to the extent permitted by the law of the forum state. The Texas long-arm statute authorizes the exercise of personal jurisdiction to the full extent allowed by the Due Process Clause of the Fourteenth Amendment. Defendants have each purposefully availed themselves of the benefits and protects of Texas by establishing minimum contacts with Texas.

**ANSWER:**

The allegations in Paragraph 5 of the Complaint are conclusion of law to which no response

is required. To the extent a response is deemed required, Defendants deny the allegations contained

in Paragraph 5.

**COMPLAINT ¶6:**

Specifically, Defendants directed their conduct toward the State of Texas by each contracting by mail or otherwise with a Texas resident—Plaintiff ITG. The transaction was to be performed in whole or in part in Texas, including but not limited to Plaintiff's payment of the cash portion of the contract consideration and Plaintiff's obligations to pay the financed portion of the contract consideration. Defendants directed their conduct toward Texas by specifically holding a substantial portion of their meetings, negotiations, and discussions regarding the contract in Texas. The contract was executed in whole or in part in and from Texas; the execution of the contract was coordinated from, and Defendants' signatures made in or forwarded to, Texas. The litigation results from Defendants' contacts with the State of Texas as a result of Defendants' breach of the contract that resulted in Plaintiff's injuries and damage, the effects of which were felt entirely or primarily in Texas. In other words, each Defendant has purposefully availed itself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and the exercise of jurisdiction over them does not offend 'traditional notions of fair play and substantial justice.

**ANSWER:**

Defendants deny the allegations in Paragraph 6 of the Complaint.

**COMPLAINT ¶7:**

Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district—namely, Brenham, Washington County, Texas. Further and in the alternative, venue is proper in this district under 28 U.S.C.A. § 1391(b)(3) because Defendants are subject to this court's personal jurisdiction with respect to this action, as set forth above.

**ANSWER:**

The allegations in Paragraph 7 of the Complaint are conclusion of law to which no response

is required. To the extent a response is deemed required, Defendants deny the allegations contained

in Paragraph 7.

## BACKGROUND FACTS

*Nature of the Case*

**COMPLAINT ¶8:**

Plaintiff brings this suit for Twister Trailer's breach of a signed, written agreement to sell and transfer a business to Plaintiff. After extensively negotiating with Plaintiff, providing voluminous information for Plaintiff's due diligence, and executing final and binding purchase and sale documents—all while represented by counsel—Twister Trailer failed to close the sale as promised, costing Plaintiff many millions in lost benefit of the bargain damages on top of hundreds of thousands of dollars in time and costs wasted on the deal. Plaintiff now sues to recover its losses from Twister Trailer's breach of contract.

**ANSWER:**

Defendants admit that Plaintiff alleges a breach of contract claim, but deny the remaining

allegations in Paragraph 8 of the Complaint.

*The Initial Discussions for ITG to Purchase Twister Trailer's Business*

**COMPLAINT ¶9:**

Plaintiff, ITG, was founded and formed by Daniel Perez in or around September 2023 for the purpose of expanding Perez's existing business of manufacturing trailers for transporting livestock. Shortly after forming ITG, Perez began to explore acquiring, owning, and managing the assets and business of Defendants. Chief among those assets was Twister Trailer, a nationally-recognized brand of high-end horse trailers featuring customized living quarters.

**ANSWER:**

Defendants admit that Twister Trailer is a national-recognized brand of high-end horse trailers featuring customized living quarters.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 9, and therefore deny the same.

**COMPLAINT ¶10:**

Daniel Perez, of Brenham, Texas, has been in the trailer business for close to two decades. Prior to the events giving rise to this lawsuit, his previous company, Rhino Trailers, LLC ("Rhino Trailers"), manufactured and sold a high-quality line of stock trailers. On the strength of his extensive history and experience manufacturing, marketing, and selling trailers, Daniel Perez founded Rhino Trailers, with immediate success. In its first twelve months of operations, Rhino Trailers grossed close to $1 million in sales.

**ANSWER:**

Upon information and belief, Defendants admit that Rhino Trailers, LLC manufactured and sold stock trailers.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10, and therefore deny the same.

**COMPLAINT ¶11:**

Defendant Short Go, owned by Brent Mosing of Lafayette, Louisiana, manufactures Twister Trailers. Defendant Boss Ranch, also owned by Mosing, owns the real property on which Short Go manufactures Twister Trailers, a 4.4-acre parcel located at 1789 US 54, Fort Scott, Kansas 66701, known as the "HWY 54 Property."

**ANSWER:**

Defendants admits that Short Go and Boss Ranch are owned by Brent Mosing of Lafayette, Louisiana and that Short Go manufactures Twister Trailers. Defendant further admits that Boss Ranch owns the property at 400 North National Avenue, Fort Scott, Kansas, 66701.

Defendants deny the remaining allegations in Paragraph 11.

**COMPLAINT ¶12:**

Based in Fort Scott, Kansas, Short Go's line of Twister Trailers was once a leading brand of so-called "live-in" trailers—trailers that can not only haul livestock but also include living quarters for horse enthusiasts, rodeo cowboys, and others needing to transport livestock and stay overnight or for extended periods away from home. However, in recent years, the Twister Trailer product line has struggled financially due to poor management and inefficiencies.

**ANSWER:**

Defendants admit that Twister Trailers are live-in trailers that can not only haul livestock but also include living quarters.

Defendants deny the remaining allegations in Paragraph 12 of the Complaint.

**COMPLAINT ¶13:**

Almost since its inception, Rhino Trailers had manufactured its trailers in Mexico at a contract facility using tools and other manufacturing equipment designed and developed by Daniel Perez. This cost-saving arrangement, while conducive to Rhino Trailer's bottom line, did not jibe with one of Perez's long-term business goals of helping to create manufacturing jobs in America. Therefore, for several years prior to the events giving rise to this lawsuit, Perez had been looking to move Rhino Trailers' manufacturing from Mexico to the United States. Such a move would further enable Rhino Trailers to promote a "Made in America" brand offering, an important consideration for many in the market for live-in livestock trailers.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13, and therefore deny the same.

**COMPLAINT ¶14:**

At the same time, Daniel Perez was very familiar with the reputation and value of the Twister Trailer brand. Through his relationships with trailer dealers across Texas and other states, he was also familiar with the recent struggles Twister Trailer was having meeting dealer demand.

**ANSWER:**

Defendants deny that Twister Trailer was having recent struggles meeting dealer demand.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 14, and therefore deny the same.

**COMPLAINT ¶15:**

Coupling his desire to move Rhino Trailers' manufacturing to America with his knowledge of Twister Trailer's struggles and declining market share, Perez began to look into the potential opportunity to acquire Twister Trailer's brand and manufacturing facilities. The acquisition would consolidate Rhino Trailers' stock trailer operation with the U.S.-made Twister Trailer product line under a new entity, Plaintiff ITG. By combining the manufacturing capacity and the sales and service operations of the two business, ITG would be able to increase efficiency of the Twister Trailer manufacturing business and the Rhino Trailer product lines to meet dealer and consumer demand while improving the market share of both product lines in a cost-efficient manner.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15, and therefore deny the same.

**COMPLAINT ¶16:**

In or around mid-October 2023, Perez and Mosing discussed ITG's desire to acquire the business of Twister Trailer from Defendants as part of this strategy. Perez shared his vision of combining the Twister Trailer and Rhino Trailer operations and the benefits that would result. Mosing indicated he had been looking for a business proposal that would allow Defendants (and Mosing personally) to exit the Twister Trailer business.

**ANSWER:**

Defendants admit that in or around mid-October or early November, Perez and Mosing discussed Plaintiff's desire to acquire the business of Twister Trailer and related property and assets.

Defendants deny the remaining allegations in Paragraph 16.

**COMPLAINT ¶17:**

The discussion proved positive, and the two sides committed to continue discussions, with Mosing following up the following day by email: "I believe the plan you presented is a very good start to getting this buyout to the finish line. Let's see if we can hammer down a little more with the details." At or around this time, both sides of the potential transaction retained counsel and continued to discuss and negotiate the terms under which Perez (through Plaintiff ITG) would acquire Twister Trailers from Defendants and Mosing.

**ANSWER:**

Defendants state that the correspondence between the parties speaks for itself, and to the extent that the language quoted in Paragraph 17 differs from the language in that correspondence, such allegations are denied.

Defendants deny the remaining allegations in Paragraph 17.

### *The Negotiation and Execution of the Asset Purchase Agreement*

**COMPLAINT ¶18:**

Given the initial positive feedback from Mosing and Twister Trailer, Perez began focusing on securing an investor to provide the capital ITG would require to purchase the Twister Trailer business and to operate it after the closing. Eventually, by early 2024, Perez and ITG had reached an agreement with such an investor ("the Investor"). The Investor agreed to invest approximately $2.7 million to provide the capital necessary to (i) fund the initial cash purchase price for ITG to acquire Short Go and Boss Ranch, (ii) fund ITG's acquisition of the Rhino Trailer business, and (iii) provide ITG additional working capital to help fund the combined business operations following the purchase.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18, and therefore deny the same.

**COMPLAINT ¶19:**

Discussions between ITG and Twister Trailer (through Mosing) continued, and a preliminary purchase structure was developed that included (1) an asset sale priced at approximately $4.268 million, including the HWY 54 Property, usable raw material inventory, tools, equipment, and machinery, and the Twister Trailer name, intellectual property, design drawings, patents, and software; (2) a three-year property lease for Twister Trailer's office property located in downtown Fort Scott, Kansas; and (3) Short Go's retention of 100% of dealer floor plan loan revenue up to $5 million for a 5-year period on products manufactured by ITG. The total purchase price of approximately $4.268 million was to be paid with $500,000 cash at closing, with the balance seller-financed at 4% APR, $10,000 per month (later adjusted to just over $12,000 per month due to interest rate fluctuations) for 84 months beginning 90 days after closing, and a balloon payment of approximately $3.4 million due after 7 years.

**ANSWER:**

Defendants admit that discussions continued with ITG and state that the correspondence between the parties speaks for itself, and to the extent the language differs from that correspondence, such allegations are denied.

Defendants deny the remaining allegations in Paragraph 19.

**COMPLAINT ¶20:**

In addition, Twister Trailer sought to include a $3 million earn-out in the purchase, which would have obligated ITG to pay 5% of its post-closing gross revenue to Mosing (through Short Go) annually until the full $3 million earn-out had been paid. However, after further due diligence, on or about May 22, 2024, Perez informed Mosing that the $3 million earn-out was not supported by Twister Trailer's then-existing margins. Perez informed Mosing that if Twister Trailer insisted on the earn-out provision, ITG would have to pass on the deal. Perez provided Mosing with an updated proposed term sheet excluding the earn-out provision and informed him that ITG's attorney would forward a revised contract omitting the earn-out provision.

**ANSWER:**

Defendants admit that a $3 million earn-out was sought and initially agreed upon by Plaintiff.

Defendants deny the remaining allegations in Paragraph 20.

**COMPLAINT ¶21:**

On June 4, 2024, ITG's attorney emailed Mosing and Twister Trailer's attorney an updated revision to the draft Asset Purchase Agreement. That revised draft contained full-color "redlined" revisions, including striking through the previous "Section 3.1 Purchase Price" language containing the earn-out provision:

> (d)     ~~Total Earn Out Amount: Three Million and No/100 Dollars ($3,000,000.00).~~
>
> (e)     ~~Annual Earn Out Payment: Each year Buyer shall pay to Seller an amount equal to five percent (5%) of gross revenue of the Business for the preceding year. The first measuring period shall begin on the day after the Closing Date and shall end on December 31, 2024. The second year and all subsequent years, until the entire Total Earn Out Amount is paid in full, shall be measured from January 1 to December 31 of each year.~~

**ANSWER:**

Defendants state that the correspondence and version of the draft Asset Purchase Agreement between the parties speaks for itself, and to the extent that the language quoted in Paragraph 21 differs from the language in that correspondence, such allegations are denied.

**COMPLAINT ¶22:**

Four days later, on Saturday, June 8, 2024, Mosing returned his own revised version of the draft Asset Purchase Agreement accepting the deletion of the earn-out provision and making a handful of minor changes, mostly to remove his name from the agreement personally, "so there will be no tie to me personally as indemnifying or having personal liability." Mosing concluded his email, "Once these corrections are approved and done, send a clean copy back to me to sign." Three days later, on Tuesday, June 11, 2024, ITG's counsel responded, "Brent: We are good to go. I will clean up the final draft and send for signature."

**ANSWER:**

Defendants state that the correspondence and version of the draft Asset Purchase Agreement between the parties speaks for itself, and to the extent that the language quoted in Paragraph 22 differs from the language in that correspondence, such allegations are denied.

Defendants further deny the remaining allegations in Paragraph 22.

**COMPLAINT ¶23:**

That evening, June 11, 2024, ITG's counsel emailed Mosing and his attorney: "Here is the signature version of the Asset Purchase Agreement." The attached version of the agreement did not include the provision for an earn-out payment.

**ANSWER:**

Defendants state that the correspondence and version of the draft Asset Purchase Agreement between the parties speaks for itself, and to the extent that the language quoted in Paragraph 23 differs from the language in that correspondence, such allegations are denied.

Defendants further deny the remaining allegations in Paragraph 23.

**COMPLAINT ¶24:**

Less than two days later, on the afternoon of June 13, 2024, Mosing returned his signature on the signature page of the Asset Purchase Agreement as an attachment to an email (with his lawyer copied) with the signature line, "Signed page," and the message, "Let me know if this is good or you need the whole contract together with signature." Minutes later, ITG's attorney emailed Mosing and his attorney, "I'm attaching the complete agreement here with Brent's signature page," with instructions for Perez to sign for ITG and return for circulation of the fully-executed document.

**ANSWER:**

Defendants state that the correspondence and version of the pages related to the draft Asset

Purchase Agreement between the parties speaks for itself, and to the extent that the language

quoted in Paragraph 24 differs from the language in that correspondence, such allegations are

denied.

Defendants further deny the remaining allegations in Paragraph 24.

**COMPLAINT ¶25:**

At 5:05 p.m. on Thursday, June 13, 2024, ITG's counsel sent an email to Mosing, his attorney, and ITG's Perez attaching the fully executed "ASSET PURCHASE AGREEMENT among INTERNATIONAL TRAILER GROUP, LLC, a Texas limited liability company, as Buyer, and SHORT GO, INC., a Louisiana Corporation, and BOSS RANCH, LLC, a Louisiana limited liability company, as Sellers," dated June 12, 2024 (hereafter, the "APA").

**ANSWER:**

Defendants state that the correspondence and version of the draft Asset Purchase

Agreement between the parties speaks for itself, and to the extent that the language quoted in

Paragraph 25 differs from the language in that correspondence, such allegations are denied.

**COMPLAINT ¶26:**

In his email forwarding the full-executed APA signed by ITG and both Defendants, ITG's counsel stated, "I will follow up early next week to start talking about documents and materials to prepare for a closing."

**ANSWER:**

Defendants state that the correspondence and version of the draft Asset Purchase Agreement between the parties speaks for itself, and to the extent that the language quoted in Paragraph 26 differs from the language in that correspondence, such allegations are denied.

Defendants further deny the remaining allegations in Paragraph 26.

***Twister Trailer's Refusal to Close on the Purchase and Sale***

**COMPLAINT ¶27:**

Following execution of the APA, ITG took numerous actions to prepare to close on the purchase, assume operation of the Twister Trailer business, and begin to implement its strategy of consolidating the Rhino Trailer and Twister Trailer manufacturing and sales operations to increase efficiency and improve the dealer and customer experience, all to restore the Twister Trailer brand to its former prominence in the marketplace.

**ANSWER:**

Defendants deny the allegations in Paragraph 27.

**COMPLAINT ¶28:**

Most importantly, shortly after all parties executed the APA, Perez informed Rhino Trailers' manufacturing contractor in Mexico that it would be terminating that contract effective shortly after the August 2024 closing. With ITG acquiring the manufacturing facilities, equipment, tools, and machinery of Short Go, Perez and Rhino would no longer require Rhino's stock trailers to be manufactured in Mexico. Indeed, combining those manufacturing operations with the Twister Trailer manufacturing operations at the HWY 54 Property in Fort Scott, Kansas, was one of the key components of ITG's strategy to increase efficiency of both product lines, improve the margins of the combined business, and restore value to the Twister Trailer brand.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 and therefore deny the same.

**COMPLAINT ¶29:**

Further, in the weeks immediately following execution of the APA, ITG worked tirelessly to prepare to close the purchase by the Closing Date (set by agreement of all parties for August 1, 2024). For example, on June 25, 2024, ITG's counsel sent Perez and Mosing a "Closing Checklist" listing the various Exhibits and Schedules to the APA that needed to be finalized for closing, along with the current status of each. Defendants, through Mosing and his attorney, worked extensively

with Perez and ITG to provide the financial data, legal property descriptions, and other information provided in the APA to close the purchase and sale.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 29 and therefore deny the same.

**COMPLAINT ¶30:**

By July 30th, the deal was ready for closing on the agreed August 1st date. At 11:51 a.m. on Tuesday, July 30, 2024, ITG's attorney sent Mosing and his lawyer final closing documents for their review with the message, "Please review as quickly as possible so we can compile our closing package for signature on Thursday morning [August 1, 2024]. I need wiring instructions for Short Go."

**ANSWER:**

Defendants state that the correspondence and version of the pages related to the draft Asset

Purchase Agreement between the parties speaks for itself, and to the extent that the language

quoted in Paragraph 30 differs from the language in that correspondence, such allegations are

denied.

Defendants further deny the remaining allegations in Paragraph 30.

**COMPLAINT ¶31:**

At 2:30 p.m. on Tuesday, July 30, 2024, an employee of Twister Trailer named Angela Collins sent Mosing and Perez the information on Short Go's wiring instructions at Hancock Whitney Bank in Lafayette, Louisiana; minutes later, Mosing forwarded those wiring instructions to ITG's attorney.

**ANSWER:**

Defendants admit that on Tuesday, July 30, 2024, Angela Collins sent Mosing and Perez

Short Go's wiring information including Hancock Whitney Bank in Lafayette, Louisiana.

Defendants further admit that those instructions were forwarded by email at 2:35 p.m.

**COMPLAINT ¶32:**

Also on July 30, 2024, ITG's counsel sent instructions to the Investor to wire the funds necessary to pay the cash closing and close the purchase and sale, along with the additional funds

for initial operating capital for ITG to operate the combined Twister Trailers and Rhino Trailers business post-closing. The Investor wired the agreed upon funds—in excess of $1.3 million—into the IOLTA account of ITG's counsel. The funds were in ITG's possession and available for payment at closing as required—had Twister Trailer closed the purchase and sale as they were obligated to do.

**ANSWER:**

Defendants admit that there was correspondence between the parties that speaks for itself, and to the extent that allegations in Paragraph 30 differ from the language in that correspondence, such allegations are denied.

Defendants further deny the remaining allegations in Paragraph 32.

**COMPLAINT ¶33:**

At 8:25 p.m. on July 30, 2024, ITG's counsel emailed Mosing and his lawyer, "I am going to start feeding you guys the closing documents to be signed on Thursday. Please review and respond to each email with any comments / questions / edits you may have." Over the next few hours, ITG's counsel did exactly that, forwarding the various documents Mosing needed to sign on behalf of Twister Trailer to close the purchase and sale of the Twister Trailer business to ITG (including, notably, the "Closing Statement"). At no point did Mosing indicate or even hint he did not believe the APA was final, or that the purchase and sale was not ready to close as agreed, or that Twister Trailer did not intend to close as promised. Mosing even responded to one of those documents with the comment, "I cut out the section of employee benefits out of the manual and put in project twister. Let me know if this works for you."

**ANSWER:**

Defendants state that the correspondence between the parties speaks for itself, and to the extent that the language quoted in Paragraph 33 differs from the language in that correspondence, such allegations are denied.

Defendants further deny the remaining allegations in Paragraph 33.

**COMPLAINT ¶34:**

The exchange continued the following day. Shortly after 5:00 p.m. on July 31, 2024, ITG's counsel had a telephone call with Twister Trailer's attorney on the deal to discuss minor revisions and corrections to a handful of the closing documents. Again, at no point during that call did Twister Trailer's attorney indicate a problem with the consideration for the purchase and sale, or any question about the finality of the APA, or any doubt about whether the purchase and sale would close the following day.

**ANSWER:**

Defendants admit that a telephone conversation took place between the parties' counsel on July 31, 2024.

Defendants deny the remaining allegations in Paragraph 34.

**COMPLAINT ¶35:**

On the morning of August 1, 2024, ITG's attorney notified Twister Trailer (through Mosing and their attorney) that all final closing documents were ready to be signed, that ITG was ready to sign them, and to advise when Twister Trailer and Mosing were ready for him to "start sending the documents through DocuSign for electronic signature." ITG was ready, willing, and able to close on August 1, 2024, as both sides had agreed.

**ANSWER:**

Defendants state that the correspondence between the parties speaks for itself, and to the extent that the language quoted in Paragraph 35 differs from the language in that correspondence, such allegations are denied.

Defendants further deny the remaining allegations in Paragraph 35.

**COMPLAINT ¶36:**

But Twister Trailer refused to close as agreed. Sometime between 6:00 p.m. on July 31, 2024, and noon on August 1, 2024, Twister Trailer and Mosing reneged on the purchase and sale and refused to close. Mosing called Perez to apologize and gave the excuse that he "didn't realize we were actually closing." Twister Trailer's lawyer called ITG's lawyer and gave the excuse that Mosing "didn't realize" the $3 million earn-out had been removed from the deal nearly two months earlier when he signed the APA. Both offered vague indications of a desire to "work this out" and see if the two sides could move forward with the sale on new terms.

**ANSWER:**

Defendants admit that the $3 million earn-out initially agreed upon by the parties was removed.

Defendants deny the remaining allegations in Paragraph 36.

**COMPLAINT ¶37:**

But ITG already had a binding deal on agreed terms to purchase the business from Twister Trailer. Instead of honoring that deal and closing as promised, Twister Trailer (through Brent

-15-

Mosing) attempt to re-trade the deal by refusing to close unless ITG paid an additional $3 million. Once the Investor learned of Twister Trailer's 11th-hour refusal to close without an additional $3 million, the Investor withdrew from the investment and requested a return of its funds. The deal, in other words, was dead.

**ANSWER:**

Defendants deny the allegations in Paragraph 37.

**COMPLAINT ¶38:**

To compound the damage, the Mexican fabrication contractor upon whom whom Perez and Rhino Trailers relied for manufacturing Rhino Trailers could no longer provide capacity for manufacturing trailers for Rhino. When Perez had informed the fabricator that Rhino would not be continuing the contract in light of Twister Trailer's execution of the APA, the fabricator removed the custom-designed tools and fabrication it had been using to manufacture Rhino's trailers and found new contracts for other customers. Having re-tooled its plant and committed its manufacturing capacity elsewhere, the contractor was no longer able or willing to resume manufacturing trailers for Rhino.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 38 and therefore deny the same.

**COMPLAINT ¶39:**

In other words, not only had ITG lost the new manufacturing facilities Twister Trailer had agreed to sell under the APA, but it had also given up its prior manufacturing pipeline when Twister Trailer bound itself to the sale under the APA.

**ANSWER:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 39 and therefore deny the same.

**COMPLAINT ¶40:**

Twister Trailer's refusal to close on the terms agreed in the APA was without excuse or justification, and in breach of the APA.

**ANSWER:**

Defendants deny the allegations in Paragraph 40.

**COMPLAINT ¶41:**

As a result of Twister Trailer's breach, Plaintiff ITG has been deprived of its benefit of the bargain—the acquisition of an established and valuable brand with long-term value and profits far in excess of the agreed purchase price. Further and/or in the alternative, ITG has lost millions in business revenue and resulting lost profits from the loss of its Mexican manufacturing relationship in reliance on Trailer's promises under the APA. In addition, ITG has lost hundreds of thousands of dollars in time and costs invested in due diligence, attorney's fees, and personnel time to reach and prepare to close on the agreement to acquire Twister Trailer. Plaintiff ITG brings this suit to recover damages for those losses.

**ANSWER:**

Defendants deny the allegations in Paragraph 41.

## COUNT I:

### BREACH OF THE ASSET PURCHASE AGREEMENT

**COMPLAINT ¶42:**

The allegations and facts set forth in the foregoing paragraphs are hereby incorporated by reference into this cause of action as if fully set forth herein.

**ANSWER:**

Defendants repeat and reallege its answers to paragraphs 1 through 41 as though fully set

forth herein.

**COMPLAINT ¶43:**

The Asset Purchase Agreement is a valid and enforceable contract between ITG, as buyer, and Short Go and Boss Ranch, as sellers.

**ANSWER:**

Defendants deny the allegations in Paragraph 43.

**COMPLAINT ¶44:**

Pursuant to the terms of the Asset Purchase Agreement, Short Go and Boss Ranch were obligated to close the sale of Twister Trailer to ITG.

**ANSWER:**

Defendants deny the allegations in Paragraph 44.

**COMPLAINT ¶45:**

ITG fully performed or tendered full performance of its obligations under the Asset Purchase Agreement. Despite that, Short Go and Boss Ranch did not, and breached the Asset Purchase Agreement by failing to close the sale of Twister Trailer to ITG.

**ANSWER:**

Defendants deny the allegations in Paragraph 45.

**COMPLAINT ¶46:**

The Asset Purchase Agreement allows attorneys' fees in the event ITG is required to bring legal proceedings for its enforcement.

**ANSWER:**

Defendants admit that the draft Asset Purchase Agreement includes an attorney's fees

provision. Defendants deny the remaining allegations in Paragraph 46.

**COMPLAINT ¶47:**

As a result of Short Go's and Boss Ranch's breach, International Trailer Group has incurred the following damages:

a.  Actual, direct damages in the amount of Plaintiff's lost benefit of the bargain from the purchase of Twister Trailer under the Asset Purchase Agreement;

b.  Actual, consequential damages in the amount of Plaintiff's reasonably foreseeable lost profits from the purchase of Twister Trailer under the Asset Purchase Agreement;

c.  Actual, reliance-based damages in the amount of Plaintiff's lost profits resulting from the loss of its Mexican manufacturing contract and resulting loss of product inventory, which Plaintiff terminated after Defendants' execution of the APA and in reliance on Defendants' promises in the APA;

d.  Out-of-pocket costs incurred in connection with the Asset Purchase Agreement; and,

e.  Reasonable attorney's fees incurred to enforce the Asset Purchase Agreement.

**ANSWER:**

Defendants deny the allegations in Paragraph 47.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully asks the Court to enter judgment in Plaintiff's favor and against Defendants for the following relief:

(a)      Money damages in an amount not less than $8.3 million, including Plaintiff's lost benefit of the bargain, reasonably foreseeable consequential damages and lost profits, reliance damages, and out-of- pocket expenses incurred in performance of the contract;

(b)      Pre-judgment interest at the maximum rate allowable by law;

(c)      Post-judgment interest at the maximum rate allowable by law;

(d)      Reasonable attorney's fees incurred in enforcing the APA; and,

(e)      Such other and further relief as the Court may deem just and proper.

## ANSWER:

Defendants deny that Plaintiff is entitled to any of the relief requested in the "WHEREFORE" clause of the Complaint.

## AFFIRMATIVE DEFENSES

Defendants state the following Affirmative Defenses to Plaintiff's Complaint. In asserting these Affirmative Defenses, Defendant does not assume the burden of proof as to matters that, pursuant to law, are Plaintiff's burden to prove. Defendants also reserve the right to plead any additional Affirmative Defenses as they become known during the pendency of this action.

### FIRST AFFIRMATIVE DEFENSE
### Lack of Contract

No valid and enforceable agreement existed between the parties with respect to the matters alleged and any alleged agreement is unenforceable for lack of valid consideration.

## SECOND AFFIRMATIVE DEFENSE
### Prior Material Breach

Plaintiff's claims are barred, in whole or in part, because of its own prior material breach of the alleged agreement.

## THIRD AFFIRMATIVE DEFENSE
### No Injury

Plaintiff's claims are barred, in whole or in part, because Plaintiff did not suffer any injury as a result of the alleged violations or actions by Defendants.

## FOURTH AFFIRMATIVE DEFENSE
### Estoppel

Plaintiff is equitably estopped from asserting its claims for relief because Plaintiff has, by its own conduct, intentionally induced, caused, and/or contributed to the alleged conduct of Defendants of which it now complains.

## FIFTH AFFIRMATIVE DEFENSE
### Failure to Mitigate

To the extent Plaintiff sustained or has suffered any injuries, damages, or loss by reason of any act of Defendants alleged in the Complaint, which Defendants deny, Plaintiff has failed to mitigate those damages and its claims are therefore barred in whole or in part.

## PRAYER

Defendants respectfully request that the Court dismiss Plaintiff's suit, render judgment that Plaintiff take nothing, assess costs against Plaintiff, and award Defendants all other relief to which Defendants are legally and/or equitably entitled.

DATED:  May ___, 2026

Respectfully submitted,

SEYFARTH SHAW LLP


By: *[DRAFT]*                      

    Jesse M. Coleman
    TX Bar No. 24072044
    jmcoleman@seyfarth.com
    700 Milam Street, Suite 1400
    Houston, TX  77002-2812
    Telephone:  (713) 238-1805
    Facsimile:  (713) 821-0659

    Mitch Robinson (Admitted *Pro Hac Vice*)
    GA Bar No. 457665
    mrobinson@seyfarth.com
    SEYFARTH SHAW LLP
    1075 Peachtree Street, N.E.
    Suite 2500
    Atlanta, Georgia  30309-3958
    Telephone:  (404) 885-1500
    Facsimile:  (404) 892-7056

    Attorneys for Defendant
    SHORT GO, INC. d/b/a TWISTER TRAILER
    and BOSS RANCH, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May _____, 2026, I caused the foregoing document to be filed with the Clerk of the Court via the CM/ECF system, which will electronically serve upon all counsel of record, including:

> Douglas A. Daniels
> Doug.daniels@dtlawyers.com
> DANIELS & TREDENNICK PLLC
> 6363 Woodway, Suite 700
> Houston, Texas  77057
>
> **OF COUNSEL:**
> Jordan T.J. Howes
> Jordan@dtlawyers.com
> DANIELS & TREDENNICK PLLC
> 6363 Woodway, Suite 700
> Houston, Texas  77057

> *[DRAFT]*
> Jesse M. Coleman

325973517v.4